UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____x

MICHAEL SAUNDERS,

        Plaintiff,

- against -

NATHAN CAVADA, JIMMY JAZZ, INC.,
TYLER MOULTON and "John Does" Nos. 1-12,

        Defendants.
_____x

Case No.:

**COMPLAINT**

Jury Demanded

      Plaintiff, by his attorney, WILLIAM A. THOMAS, upon information and belief, alleges the following:

### INTRODUCTION

      1.     This action seeks money damages for civil rights violations and common law torts committed by the defendants in connection with the August 23, 2016, arrest and ensuing criminal prosecution of plaintiff for alleged involvement in a series of fraudulent credit-card transactions at the Jimmy Jazz retail store in Rosedale, Queens County, New York. A longtime customer of the store and known to its employees and management, plaintiff was nonetheless arrested by defendant Cavada, a New York City police detective, charged, and thereafter prosecuted with the encouragement and participation of Jimmy Jazz management despite plaintiff's strenuous denial of involvement and total lack of connection to the three other individuals who concededly engaged in the transactions. Moreover, plaintiff's physical appearance--other than insofar as he was a bearded African-American male--was so palpably unlike that of the unidentified fourth perpetrator seen on video surveillance as to demolish probable cause for plaintiff's arrest. This

point was or in the exercise of reasonable police practice should have been obvious to defendant Cavada, the NYPD detective who nonetheless ordered plaintiff's arrest, interviewed plaintiff, signed the criminal information, testified before the grand jury and at plaintiff's trial, and otherwise cooperated in plaintiff's criminal prosecution. Tellingly, the video surveillance itself was withheld from the grand jury, doubtless because plaintiff' had personally appeared before them and the prosecution well knew that any comparison would instantly vitiate a true bill. The motives of both Cavada and Jimmy Jazz management for this knowing prosecution of an innocent customer were mutually self-serving: to hasten closure of the case by simply charging the four purported individuals seen on video making the purchases, while declining to seek prosecution of, or even interviewing, Jimmy Jazz cashiers and/or employees clearly shown to be facilitating the purchases. This complicity between Jimmy Jazz employees and the "customer" perpetrators reportedly occurred at both the subject store and additional Jimmy Jazz locations, and several such employees were terminated by Jimmy Jazz in the wake of the transactions after they were brought to light. In neither arresting these complicit employees nor even interviewing them about the identity of the fourth perpetrator--that is, in declining to speak to the only known eyewitnesses--Cavada both derelicted basic police procedure and did the bidding of Jimmy Jazz management, who offered to acquiesce in plaintiff's wrongful prosecution in exchange for Cavada's ignoring the now-fired Jimmy Jazz employees and thus sparing relevant managers and the company itself from the possible consequences—intra-corporate as well as legal, commercial, and reputational—of a company-wide scandal. The fourth perpetrator, falsely alleged by Cavada to have been plaintiff, presumably remains at large, as a jury acquitted plaintiff of all charges, including multiple felony counts, on June 1, 2018, following a criminal trial.

## PARTIES

2. At all times herein plaintiff, MICHAEL SAUNDERS, was a resident of the City and State of New York, County of Queens, and is currently a resident of the State of New Jersey 125 Dodd Street, East Orange, New Jersey 07017.

3. Defendant NATHAN CAVADA ("Cavada") and was at all times relevant an employee of the New York City Police Department, with the rank of Detective and working out of the 105TH Precinct in Queens.

4. Defendant JIMMY JAZZ, INC. ("Jimmy Jazz") is a closely held New York corporation with offices located at 43 Hall Street, Brooklyn, NY 11205. Jimmy Jazz is an urban clothing and shoe retailer that operates approximately 170 apparel and footwear retail stores for men, women, and children in the eastern United States. According to Bloomberg.com, Jimmy Jazz is based in Brooklyn with offices at 43 Hall Street, Brooklyn, New York, and was founded in 1989 by Jimmy Khezrie, who remains president and CEO. On information and belief, Khezrie remains principal owner of Jimmy Jazz, and holds overlapping interests in other apparel companies also based at 43 Hall Street, Brooklyn.

5. Defendant TYLER MOULTON ("Moulton") is and all relevant times was a district manager employed by Jimmy Jazz, and at all times acted in the scope of his employment. He is believed to be a citizen of the state of Connecticut.

6. Defendants JOHN DOE 1-12 are unknown persons employed by Jimmy Jazz who are believed to have conspired with the named defendants to commit and abet the wrongful arrest and prosecution of plaintiff as set forth.

## JURISDICTION AND VENUE

7.      This Court has original jurisdiction over the federal claims herein pursuant to 28 U.S.C. § 1331.

8.      This Court has diversity jurisdiction over all other claims pursuant to 28 U.S.C. § 1332 insofar as plaintiff is a citizen of New Jersey and all defendants are citizens of states other than New Jersey, and the amount in controversy is over $75,000.  Should the Court lack diversity jurisdiction over the state-law claims, supplemental jurisdiction lies pursuant to 28 U.S.C. § 1367 insofar as they are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b) and (c) as the defendants are located in the Eastern District of New York and/or the events giving rise to the claims occurred in this district.

10.     Within ninety days of accrual of plaintiff's state-law claims against defendant Cavada, plaintiff filed with the City of New York a notice of claim pursuant to General Municipal Law § 50-e, setting forth the name and address of claimant and his attorney; the nature of the claim and the time, place and manner in which it arose; and the damages or injuries claimed.  More than thirty days have elapsed since the filing and no adjustment of the claim has been made.

## FACTS

11.     On or about July 7, 2016, defendant Cavada watched a surveillance video of multiple individuals committing credit card fraud at a Jimmy Jazz store at 253-01 Rockaway Boulevard in Rosedale, Queens, New York.

12. On or about August 23, 2016, defendant Cavada, acting at all times under color of state law and without probable cause, effected the arrest of plaintiff at his residence in Queens County, based on alleged theft and possession of stolen goods in connection with transactions involving stolen credit cards at the Jimmy Jazz store at 253-01 Rockaway Boulevard, Rosedale, Queens, New York.

13. At no time did Cavada or any other person recover any physical evidence whatsoever linking plaintiff with the subject transactions, e.g., credit cards, receipts or merchandise.

14. Plaintiff was forcibly detained against his will and imprisoned by defendant Cavada at the 105th Precinct, was conscious of his confinement, and did not consent to such confinement, and such confinement was not otherwise privileged as there was no probable cause for an arrest.

15. Plaintiff was forced to have his fingerprints examined, had a DNA sample taken, and was photographed.

16. In the course of this detention plaintiff was interviewed by defendant Cavada, and plaintiff, who freely acknowledged that he was a regular customer at the Jimmy Jazz store, vigorously denied involvement in or any knowledge whatsoever of the subject transactions.

17. In the above-mentioned interview, Cavada had ample opportunity to observe plaintiff's physical appearance and compare it against that of the unidentified perpetrator shown in the video, whom Cavada thereafter alleged to have been the plaintiff. Such a comparison would have readily disclosed that, among other salient differences, plaintiff's forearms were heavily tattooed, whereas the subject perpetrator had no such tattoos; that plaintiff's hairdo—bald, save for a narrow, closely cropped "Mohawk" plaintiff had sported for so long that he was

known to Jimmy Jazz management, including defendant Moulton, as "Mr. T"—bore no remote resemblance to that of the subject perpetrator, who is seen with braids protruding from under the rear of a baseball-style cap; that plaintiff's beard was longer and of a different color from that of the subject perpetrator; that plaintiff's face in profile was of a clearly different shape from that of the subject perpetrator; that the subject perpetrator had a gap between his front teeth, whereas plaintiff has no such gap; that the subject perpetrator had larger eyes and lips than those of the plaintiff; that plaintiff's arms were significantly fuller than those of the slender-armed perpetrator in the video; and that both the upper and lower body of the plaintiff—who at the time was five-feet-ten-inches tall and weighed fully 260 pounds--were far broader than those of the subject perpetrator. In short, precisely three features undisputedly characterized both plaintiff and the perpetrator: both were bearded males, and both were African-American. Moreover, Cavada had seen a photograph of plaintiff well before arresting him. Accordingly, upon seeing plaintiff Defendant Cavada knew or had every reason to know that plaintiff was not the fourth individual who committed the credit card frauds at the Jimmy Jazz store in Rosedale.

18. After an imprisonment of several hours plaintiff was released from custody.

19. On August 23, 2016, after seeing video of the individual who committed the crimes and having seen the plaintiff in person, and therefore having personal knowledge that plaintiff was not the individual who committed the crimes, Defendant Cavada signed a sworn criminal information alleging that, in connection with fraudulent transactions made with stolen credit cards at the Jimmy Jazz store at 253-01 Rockaway Boulevard, Rosedale, New York, plaintiff had committed crimes on May 28, 2016, May 29, 2016, and June 4, 2016, including misdemeanor and felony offenses arising under New York Penal Law sections 170.25, 155.30-1, 165.45-1, and 190.81.

20. Plaintiff was arraigned in New York City Criminal Court on August 23, 2016, and the case was thereafter transferred to New York Supreme Court, criminal term.

21. Plaintiff was indicted by a grand jury for the subject offenses in late 2016.

22. There was no evidence that plaintiff had committed the above-listed crimes, and Cavada lacked probable cause for the allegations made in the sworn information.

23. Prior to and following plaintiff's arrest and indictment, defendant Cavada was aware that three other individuals, in addition to the fourth perpetrator whom Cavada alleged to be plaintiff, had committed the subject crimes on the same days at the same location. Those individuals, named Nanawoods Napoleon, William Cairns and Kendo Hammond, were ultimately charged with similar offenses and undisputedly acted in concert in committing them.

24. Despite the video surveillance showing that the four perpetrators acted in concert, and Cavada's conceded belief that that they so acted, Cavada at no point obtained any information whatsoever from Napoleon, Cairns or Hammond, or from any other source, to indicate that plaintiff was the fourth man, or that Napoleon, Cairns or Hammond as much as knew plaintiff. Plaintiff consistently denied knowing them and testified before the grand jury that he did not know them. Nor did Cavada at any time obtain a shred of independent evidence linking plaintiff to any of those three persons socially, professionally, or otherwise. Before arresting plaintiff, however, Cavada was additionally aware that Napoleon and Hammond were associated with one another through a widely-viewed internet television show called "Money and Violence" starring Napoleon and Hammond. Cavada had seen episodes of the show on YouTube and additionally seen Napoleon's social media posts likewise connecting him to Hammond. Conversant with their on-line profiles and thus with their likely acquaintances, Cavada was keenly aware that, by contrast, nothing whatsoever on the internet, including social

media, connected plaintiff with the three other conceded perpetrators when he arrested and charged plaintiff. Subsequently, i.e, following plaintiff's indictment and during the twenty-one months preceding plaintiff's criminal trial, Cavada failed to obtain or produce evidence of any type linking plaintiff to the three conceded perpetrators.

25. In grand jury proceedings Cavada and/or the assistant district attorney wrongfully withheld powerfully exculpatory evidence, most notably the surveillance footage reflecting the overt disparities between plaintiff's appearance and that of the subject perpetrator. Cavada's testimony identifying plaintiff as the fourth perpetrator was based exclusively on (1) plaintiff's conceded history as a customer at the store, as if that was somehow incriminating, and (2) the fact that plaintiff, supposedly like the unidentified fourth perpetrator, was "a black male with a bushy beard" similar in height and weight to plaintiff--when in fact not even those latter similarities applied, and several other physical differences between the two were blindingly obvious. Such a purported identification was insufficient to confer probable cause. See Jenkins v. City of New York, 478 F.3d 76, 89 (2d Cir. 2007) (rejecting, in false arrest case under 42 U.S.C § 1983, defense of probable cause where criminal defendant and reported perpetrator had "only two common characteristics: [they were] male and black," and additionally noting differences in their hairdos). Moreover, as noted, the evidence presented to support Cavada's identification of plaintiff was based solely on Cavada's claimed recollection of the video footage, which the grand jury was never actually shown. The grand jury was thus denied a view of the lone evidence on which Cavada based his identification, instead being asked simply to take his word for it that the man in the unseen video was a dead ringer for Saunders: they were both bearded black males--enough said. Plaintiff, round-faced, mostly bald and strikingly burly at 260 pounds when arrested, appeared before the grand jury and strenuously denied knowledge of

the crimes. Had the jurors, who observed him at close range for roughly half an hour, seen the surveillance video, a finding of probable cause would have been altogether impossible; indeed, a mere comparison of the video imagery to plaintiff's mug shots would have vitiated any suggestion that they depicted the same man and would have likely elicited gales of laughter. Instead, the pivotal evidence was, albeit "described" by Cavada, wholly unseen. The grand jury's finding of probable cause was thus prohibitively tainted by the district attorney's improper, and clearly deliberate, withholding of evidence that would have instantly revealed a "needless or unfounded prosecution." People v. Valles, 62 N.Y.2d 36, 38 (1984); see also People v. Lancaster, 69 N.Y.2d 20, 26 (1986).

26. Cavada was also fully aware at all relevant times, both before arresting and charging plaintiff and during the eighteen-month pendency of plaintiff's prosecution, that certain Jimmy Jazz employees, i.e., cashiers, were complicit in the crimes, as irrefutably disclosed by the video surveillance footage. These persons could have readily confirmed or dispelled Cavada's purported belief that Saunders was the fourth perpetrator. Such employees included, without limitation, Youseff Azeal and Asia Hopson, whose names were disclosed to Cavada. But when he inquired of Jimmy Jazz management, Cavada was informed that all such employees had been fired. Notwithstanding their obvious importance as witnesses, and their possible criminal liability for the offenses at issue, Cavada made no effort to locate the only eyewitnesses to the subject events and show them a photograph of plaintiff, let alone interview them, let alone arrest them for their own manifest involvement. Detective Cavada thereby derelicted fundamental investigative and police practice. Instead, he arrested and charged plaintiff, a longtime store customer who strenuously denied knowledge or involvement; had no known links to the three

conceded perpetrators; bore no resemblance to the man in the video; and possessed not an iota of physical or documentary evidence tying him to the subject transactions.

27. Plaintiff was indicted for the above-listed offenses in 2017.

28. Both prior and subsequent to plaintiff's arrest, and notwithstanding any contrary testimony offered in the underlying criminal proceedings, Cavada had repeated communications with various Jimmy Jazz management and personnel, including defendant Moulton, regarding the clear involvement in the subject crimes by Jimmy Jazz employees, some of whom are seen on the video surveillance accepting credit cars bearing the names of multiple cardholders. Cavada was in fact aware that various employees had been terminated for their roles in the subject crimes and that, moreover, such employees had not been confined to the Rosedale store but had included other Jimmy Jazz stores in the New York City area.

29. Notwithstanding any contrary testimony offered in the underlying criminal proceedings, and despite Cavada's conceded failure to interview the fired employees, Cavada had extensive discussion with Jimmy Jazz personnel, including defendant Moulton and other managers at the store and district level, regarding the crimes committed by Napoleon, Hammond and Cairns and the complicity of Jimmy Jazz employees in those crimes, and regarding the likelihood that plaintiff was in fact the fourth perpetrator depicted in the video. Cavada's communications with these Jimmy Jazz managers revealed to Cavada both that (1) Jimmy Jazz personnel in fact had reason to doubt, and did in fact doubt, that plaintiff was the person identified in the video; and (2) that Jimmy Jazz management did not wish Cavada to interview the terminated employees, or to prosecute them, for fear of the potential negative repercussions attending the obvious managerial failure reflected by the employees' complicity in repeated credit-card crimes.

30.     On or about Friday June 1, 2018, over twenty-one months after plaintiff was arrested and charged, plaintiff was acquitted by a jury of all 36 charges. Among other evidence adduced at trial was plaintiff's cell phone records, which were fully available to defendant Cavada, reflecting that at each of the various times in question—that is, at the dates and times in which the subject crimes were recorded on video—plaintiff was nowhere near the Jimmy Jazz store in Rosedale, a fact of which Cavada was aware even as the prosecution continued for nearly two years.

### FIRST CLAIM FOR RELIEF, AGAINST DEFENDANT CAVADA: FALSE ARREST, FALSE IMPRISONMENT AND MALICIOUS PROSECUTION PURSUANT TO 42 U.S.C. § 1983

31.     Plaintiff repeats and re-alleges each of the forgoing allegations as if same were fully set forth.

32.     At all relevant times Defendant Cavada, acting under color of state law, violated plaintiff's rights under the Fourth, Fifth and Fourteenth Amendments of the United States Constitution, including, without limitation, the right not to be searched without probable cause, the right not to be falsely arrested, and the right not to be falsely imprisoned, in effecting plaintiff's arrest and detention without probable cause.

33.     Thereafter, Cavada, likewise acting under color of state law, violated plaintiff's due process rights under the Fourth, Fifth and Fourteenth amendments, including the right not to be prosecuted without cause, in causing, sustaining, and actively abetting plaintiff's prosecution without reasonable grounds to believe the allegations; and with a purpose other than merely obtaining a judgment in the proceeding, which proceeding terminated plaintiff's favor.

34. As a proximate consequence of both plaintiff's false arrest and imprisonment, and of the twenty-one-month pendency of felony charges against him and the prospect of a lengthy prison term for crimes he did not commit, plaintiff experienced emotional distress, pain and suffering, loss of quality and/or enjoyment of life, and all other damages to which the claimant is entitled to by case law and statute.

**SECOND CLAIM FOR RELIEF, AGAINST DEFENDANTS JIMMY JAZZ, MOULTON, AND JOHN DOES 1-12: MALICIOUS PROSECUTION**

35. Plaintiff repeats and re-alleges each of the forgoing allegations as if same were fully set forth.

36. In causing, sustaining, and actively abetting plaintiff's prosecution without reasonable grounds to believe the allegations, and with a purpose other than merely obtaining a judgment in the proceeding—including but not limited to the safeguarding of the interests of defendant Jimmy Jazz--which proceeding terminated plaintiff's favor, defendant Cavada maliciously prosecuted plaintiff.

37. Additionally, in a conspiracy intended to spare Defendant Jimmy Jazz and its managers the professional and reputational harm that would have followed disclosure of its employees' involvement in credit card fraud and/or theft of cardholders' identity, and concurrently to enable Cavada to expedite closure of the case, all named defendants agreed and took affirmative measures to suppress further investigation into the employees' role and thus into the identity of the fourth alleged perpetrator shown in the surveillance video, and agreed instead to seek the wrongful prosecution of plaintiff, whom they knew to be innocent.

38. The Defendants engaged in a course of conduct falsely arresting and prosecuting plaintiff, failing to investigate, hiding evidence, covering up exculpatory information, and

seeking the wrongful conviction of plaintiff, all in furtherance of an express and affirmative benefit.

39. In furtherance of the conspiracy, defendant Jimmy Jazz, by defendant Moulton and the defendant "John Doe" personnel, withheld information including the names and address of the employees involved in the crimes, and otherwise prevailed upon defendant Cavada to refrain from interviewing its former employees, knowing that such interviews would have likely exonerated plaintiff.

40. Defendant Jimmy Jazz, by defendant Moulton and the "John Doe" personnel engaged in a conspiracy with defendant Cavada and law enforcement personnel to continue the prosecution of plaintiff after the production of video evidence showing that plaintiff was not the individual responsible for the fraudulent credit card transactions, and with full awareness that plaintiff had no connection to the other perpetrators.

41. Defendant Jimmy Jazz, by defendant Moulton and the defendant "John Doe" personnel, had a malicious and improper motive for the baseless criminal case against plaintiff to continue, namely, to divert further attention by law enforcement away from its employees' criminal conduct and its own managerial failures, in order to protect the reputation of the corporation and/or its managers.

42. Defendant Cavada had a malicious and improper motive for the baseless arrest and continued prosecution of plaintiff, namely to expedite closure of his case despite his failure to identify the fourth perpetrator and to avoid the additional labor associated with interviewing, and potentially seeking prosecution of, the fired Jimmy Jazz employees.

43. The agreement by defendant Moulton and the "John Doe" personnel to engage in the above conduct was made with defendant Cavada and other law enforcement personnel, and

said persons in fact took the above described actions in furtherance of the conspiracy to prosecute plaintiff maliciously, actively abetting plaintiff's prosecution without reasonable grounds to believe the allegations, and with a purpose other than merely obtaining a judgment in the proceeding, which proceeding terminated plaintiff's favor.

44. As a proximate consequence of said malicious prosecution, including a twenty-one month pendency of felony charges against him and the prospect of a lengthy prison term for crimes he did not commit, plaintiff experienced emotional distress, pain and suffering, loss of quality and/or enjoyment of life, and all other damages to which the claimant is entitled to by case law and statute.

### THIRD CLAIM FOR RELIEF, AGAINST DEFENDANTS
### JIMMY JAZZ, MOULTON, AND JOHN DOES 1-12: NEGLIGENCE

45. Plaintiff repeats and re-alleges each of the forgoing allegations as if same were fully set forth.

46. Defendant Jimmy Jazz, collectively and by its managers and employees including but not limited to defendant Moulton and the "John Doe" defendants, owed a duty of reasonable care to plaintiff, a long time customer.

47. Said defendants breached their duty of reasonable care to plaintiff in (1) providing misleading information to Cavada and other law enforcement personnel including the district attorney's office, and/or false or evasive court testimony, about plaintiff's alleged guilt in the subject crimes; (2) failing to take affirmative measures to advise Cavada and law enforcement of what they knew to be plaintiff's innocence based on his long history as a customer at the subject store and their knowledge that he was not the perpetrator shown in the video surveillance and not associated with the other perpetrators; and (3) failing to take any

measures to come forward in plaintiff's defense despite their knowledge that he, a paying customer, was being wrongly prosecuted for a crime committed at their store and involving their own employees.

48. As a proximate result of the above negligence, plaintiff suffered permanent professional and reputational damage as well as emotional damages; was shocked, alarmed and distressed and continues to be emotionally disturbed; and was caused pain and suffering, loss of quality and/or enjoyment of life, and all other damages to which the claimant is entitled to by case law and statute.

**WHEREFORE,** plaintiff demands judgment in his favor and against the defendants on each claim for relief in the amount of THREE MILLION DOLLARS ($3,000,000.00) in compensatory damages and, because defendants' actions were at all time willful, wanton and malicious, punitive damages in amount to be determined by a jury, together with attorney's fees pursuant to 42 U.S.C. § 1988(b) and the costs and disbursements of this action, along with such other relief as the Court deems just.

Dated: New York, New York
June 1, 2019

_____
WILLIAM A. THOMAS (0116)
Attorney for Plaintiff
511 Avenue of the Americas, #352
New York, New York 10011
(917) 693-3981
wthomas@watlegal.com